IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| LARRY STREU, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| vs. ) | Case No. 07-0309-CV-ODS |
| ) | |
| DAVID DORMIRE, ) | |
| ) | |
| Respondent. ) | |

## ORDER AND OPINION DENYING PETITION FOR WRIT OF HABEAS CORPUS

### I. BACKGROUND

#### A. Procedural History

In March 2000, Petitioner was convicted of first degree murder for strangling his mother, Edis Streu (hereinafter "Edis") and was sentenced to life in prison without the possibility of parole. The Missouri Court of Appeals affirmed the conviction in an unpublished opinion. Petitioner then filed a timely motion for postconviction relief pursuant to Missouri Rule 29.15; the Missouri Court of Appeals affirmed the denial of relief in March 2005 in an unpublished opinion. Six months later, Petitioner filed a motion to reopen his 29.15 proceeding. The motion was denied, and the Missouri Court of Appeals affirmed this decision in an unpublished decision in January 2007. In April 2007, Petitioner – proceeding pro se – filed a Petition for Writ of Habeas Corpus in this Court. The Court dismissed the case as time-barred, but the Eighth Circuit appointed counsel for Petitioner and reversed the dismissal. Streu v. Dormire, 557 F.3d 960 (8th Cir. 2009). On remand, the attorney appointed to represent Petitioner on appeal entered her appearance and filed an Amended Petition. The case has proceeded on the Amended Petition.

B.  Underlying Facts

      The crime occurred on October 24, 1997.  On that day, Edis' sister-in-law (Peggy Thompson) was advised by one of Edis' brothers that he went to Edis' house but she did not answer.  Thompson telephoned Edis numerous times without success.  She called Edis' neighbor (Charlie Hamlett), who said he had not seen Edis there all day but that he had seen Petitioner's truck in the driveway.  Thompson drove to Edis' house and found it locked and no note on the door.  She then drove to Petitioner's house.  Meanwhile, Thompson's daughter-in-law (Roseann Thompson) went with her sister (Rita Kent) to look for Thompson, and arrived at Streu's house while Thompson was there.

      Thompson asked Petitioner whether he had seen his mother, and he indicated he had not.  Thompson then told him that Hamlett saw his truck there, and Petitioner stated that he had been at Edis' house but had not seen her there.  Petitioner then declared he would go to this mother's house to look for her and told Thompson to go home.  Petitioner and his sixteen-year-old son, M.S., got into Petitioner's truck and drove to Edis' house; Thompson followed Petitioner, and the other two women followed Thompson.  Upon arriving at Edis' house, Petitioner and M.S. went to the door; the women followed.  According to Kent, Petitioner told them to "stay the hell out," then went inside with his son.  After a short time, the women entered the house.  Eventually, Petitioner went out the back to the detached garage.  M.S. ran out of the garage and told the women Edis was "hanging in there."  Petitioner cut Edis down with a knife he had brought.

      Observations from that night, along with subsequent testing, demonstrated Edis had been strangled and then hung in the garage to create the impression she committed suicide.  In particular, the position of the body in rigor mortis and the absence of lividity in the lower extremities demonstrated Edis had not hung herself.  An autopsy determined that she had been strangled by a person placing their hands around her neck and squeezing for several minutes.  Experiments conducted by the crime lab also demonstrated that, based on the rope used, Edis' weight, and the condition of the

2

garage beams used, hanging Edis' dead body in the garage would have required at least two people.

M.S. was on juvenile probation at the time. On November 10, he was arrested by a juvenile officer and charged with murdering Edis. Approximately one week later, M.S. reached an agreement with the juvenile officer that he would disclose his part in the crime and testify in exchange for dismissal of charges relating to the murder and a pending probation violation based on an unrelated matter. M.S. explained that earlier in the evening he was driving Petitioner to Wal-Mart when Petitioner instructed him to drive to Edis' to help him with something. Upon entering the garage, M.S. saw his grandmother's body on the floor. Petitioner told M.S. that Edis was killed "by accident" and he wanted M.S. to help him make it look like a suicide. Petitioner lifted Edis' body, and M.S. pulled the slack out of the rope and tied it over the garage door rail. Viewed in the light most favorable to the verdict, evidence introduced at trial established Petitioner was angry that his mother was planning to sell the house. Earlier in the day Petitioner had gone to his mother's house, ostensibly to look for some tools or equipment related to his work. The State's theory was that Petitioner killed his mother earlier in the day, then went back later as M.S. described to make the murder appear to be a suicide.

Additional facts will be discussed as they relate to the issues raised in the Amended Petition.

## II. DISCUSSION
### A. Evidence of M.S.'s Prior Violent Acts

In large measure, Petitioner's theory at trial was that M.S. killed Edis.[1] Petitioner offered the testimony of Shannon Short, a friend of M.S.'s, who would have testified that he observed arguments between M.S. and Edis. He also described an incident in which

---

[1] During closing argument, Petitioner's attorney stated "I'm not saying [M.S.] did this. I'm not pointing the finger at [M.S.]." Tr. at 1105. However, the Missouri Court of Appeals characterized Petitioner's defense as being that M.S. killed Edis alone, and Petitioner's argument has little value unless this was his theory. Counsel's statement in closing may have simply been an accommodation to the judge's exclusion of the evidence in question.

3

Edis told M.S. to leave some radios alone because they belonged to Petitioner and M.S. started chasing Edis. These events occurred in the Fall of 1996, or approximately a year before Edis' death. Tr. at 1045-47.[2] Rosemarie Streu, M.S.'s sister-in-law, testified that M.S. got mad at Edis for spanking a child and pushed her down. This incident occurred two years before Edis' death. Tr. at 1048-49. In affirming the trial court's exclusion of this evidence, the Missouri Court of Appeals noted (1) the absence of any evidence connecting M.S. to the actual murder of Edis (as opposed to events occurring after her death), (2) the temporal remoteness of the events in question, and (3) the absence of a motive for M.S. to kill his grandmother.

A writ of habeas corpus shall not be issued on a claim litigated on the merits in state court unless the state court's decision

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1). Petitioner claims the exclusion of this evidence deprived him of his constitutional right to present a defense and faults the Missouri Court of Appeals for focusing on the rules of evidence more than the constitutional issue. However, the constitutional right is intertwined with evidentiary rules. While Petitioner had a fundamental right to present a defense, he still "must comply with established rules of procedure and evidence designed to assure both fairness and reliability." Chambers v. Mississippi, 410 U.S. 284, 302 (1973): see also United States v. Scheffer, 523 U.S. 303, 308 (1998). Thus, there is no constitutional right to have irrelevant evidence admitted; indeed, there is not even a constitutional right to have all *relevant* evidence automatically admitted. See Montana v. Egelhoff, 518 U.S. 37, 41-42 (1996) (plurality

---

[2]"Tr. at ___" is a reference to a page from the trial transcript.

4

opinion).  In evaluating the right to present a defense, courts usually examine the evidence's admissibility (including its relevance) among other factors.  E.g., United States v. Peltier, 585 F.2d 314, 331-34 (8th Cir. 1978), cert. denied, 440 U.S. 945 (1979).

Exclusion of evidence about M.S.'s prior actions did not violate Petitioner's constitutional rights.  There was no evidence connecting M.S. to Edis' death (as opposed to the cover-up of her murder).  The incidents in question were remote in time and much different in scope.  Accepting Petitioner's position would mean he could have presented evidence of every single person who had ever had an argument or altercation with Edis on the chance the jury might think one of those people killed Edis.  The proffered evidence falls far short of those cases Petitioner identifies in which the proffered evidence demonstrated another person either committed the crime or engaged in acts that might exonerate the defendant.  The state courts' application of the Supreme Court's prior decisions addressing the right to present a defense was reasonable.

### B.  Ineffective Assistance of Counsel: Cross-Examination of M.S.

As stated earlier, M.S. was on juvenile probation.  In addition to facing revocation and charges for Edis' murder, he also faced the possibility that revocation proceedings would be filed because M.S. had been using marijuana.  Petitioner attempted to introduce evidence of (1) the underlying offenses that caused M.S. to be on probation in the first place and (2) the fact that he faced the possibility of revocation for using marijuana.  The State filed a motion in limine to preclude this evidence, and the matter was addressed before trial in a larger discussion about permissible questions that could be posed to the juvenile officer.  At a certain point there was uncertainty as to precisely what M.S. was originally convicted of and whether they were misdemeanors or felonies.  Ultimately, counsel for the State asked if they could "hold this until tomorrow," to which counsel for Petitioner replied "sure."  Tr. at 215.  Petitioner's attorney made an offer of proof when M.S. testified, consisting of questions posed to M.S. and submission of a

5

transcript and other records. R.at 902-04.[3] However, as the Missouri Court of Appeals pointed out, counsel never formally offered the evidence – and the trial judge never actually excluded it. Consequently, there was no allegation of error on direct appeal.

In his 29.15 motion, Petitioner alleged his attorneys were ineffective for failing to attempt to introduce the evidence in question. This ground was denied because the jury was presented with evidence about M.S.'s juvenile matters. The issue was not raised on appeal from the denial of the 29.15 motion. Petitioner's argument must be rejected for two reasons: (1) it was procedurally defaulted and (2) it lacks merit.

### 1. Procedural Default

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that a failure to consider the claims will result in a fundamental miscarriage of justice.

Coleman v. Thompson, 501 U.S. 722, 750 (1991). While counsel's ineffectiveness with regard to the evidence was raised in the 29.15 motion, Petitioner defaulted the claim when he failed to appeal the trial court's denial of this ground. E.g., O'Rourke v. Endell, 153 F.3d 560, 566 (8th Cir. 1998), cert. denied, 525 U.S. 1148 (1999) (citing Williamson v. Jones, 936 F.2d 1000, 1006 (8th Cir. 1991), cert. denied, 502 U.S. 1043 (1992)).

Petitioner does not deny this claim was procedurally defaulted, but contends the default is excused by cause and prejudice. Specifically, he contends his postconviction counsel provided ineffective assistance in failing to appeal the issue. Numerous cases hold that ineffective assistance of postconviction counsel cannot be cause for a procedural default because there is no constitutional right to postconviction counsel.

---

[3]Some pages were missing from the Trial Transcript originally submitted to the Court, and the parties were directed to provide the missing pages. For some reason, the missing pages do not correspond precisely to the transcript that was provided originally. The Court has done the best it can to identify the pages in question.

E.g., Oglesby v. Bowersox, 592 F.3d 922, 925-26 (8th Cir. 2010); Morris v. Norris, 83 F.3d 268, 270 (8th Cir. 1996). Petitioner advances a variety of reasons why this rule should not apply, and further points to several cases raising this issue in which the Supreme Court has granted a Writ of Certiorari. The Court cannot presume that the granting of certiorari indicates the Supreme Court will issue a ruling one way or the other. At present the law is clear: ineffectiveness of postconviction counsel cannot constitute cause and prejudice to excuse a procedural default.

### *2. Merits*

Even if the procedural default is excused, Petitioner's claim fails on the merits for the reasons identified by the trial court that denied the 29.15 motion. The jury knew M.S. was on juvenile probation for matters unrelated to Edis' death. R. at 816, 862. Hal Riddle, the Chief of Police, testified that Petitioner was arrested in this matter. Tr. at 678. M.S. also testified that he had been taken into custody by the juvenile officer and told that he could be charged as an adult for the murder of his grandmother and could be facing a sentence up to life in prison without parole. Tr. at 850, 855-56. He was transported to a detention facility and held for approximately one week. Tr. at 857, 862. The jury also heard evidence that M.S. faced the possibility of revocation of probation for reasons unrelated to Edis' death. Tr. at 816, 862-64. M.S. testified that the charges would be dropped in exchange for his agreement to testify against Petitioner, Tr. at 865-66; see also Tr. at 852-53, and that the juvenile officer spoke with a Navy recruiter to arrange an interview for M.S. when he initially had difficulty enlisting. Tr. at 867-68.

A claim of ineffective assistance of counsel is governed by the standard set forth in Strickland v. Washington, 466 U.S. 668 (1984). "This standard requires [the applicant] to show that his 'trial counsel's performance was so deficient as to fall below an objective standard of reasonable competence, and that the deficient performance prejudiced his defense.'" Nave v. Delo, 62 F.3d 1024, 1035 (8th Cir. 1995), cert. denied, 517 U.S. 1214 (1996) (quoting Lawrence v. Armontrout, 961 F.2d 113, 115 (8th Cir. 1992)). This analysis contains two components: a performance prong and a prejudice prong.

7

> Under the performance prong, the court must apply an objective standard and "determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance," Strickland, 466 U.S. at 690, while at the same time refraining from engaging in hindsight or second-guessing of trial counsel's strategic decisions. Id. at 689. Assuming the performance was deficient, the prejudice prong "requires proof 'that there is a reasonable probability that, but for a counsel's unprofessional errors, the result of the proceeding would have been different.'" Lawrence, 961 F.2d at 115 (quoting Strickland, 466 U.S. at 694).

Id. Failure to satisfy both prongs is fatal to the claim. Pryor v. Norris, 103 F.3d 710, 713 (8th Cir. 1997) (no need to "reach the performance prong if we determine that the defendant suffered no prejudice from the alleged ineffectiveness"); see also DeRoo v. United States, 223 F.3d 919, 925 (8th Cir. 2000). "An ineffective assistance of counsel claim is a mixed question of law and fact." McReynolds v. Kemna, 208 F.3d 721, 723 (8th Cir. 2000). Consequently, the state courts' findings of historical fact are entitled to a presumption of correctness, and their application of Strickland to those facts must stand unless they applied those standards in an unreasonable manner.

Assuming, for the sake of argument, that counsel's performance was deficient for failing to offer evidence regarding the nature of M.S.'s original offenses and the reason for the other potential violation (and further assuming the evidence was admissible), the Court concludes there is no reasonable probability that the outcome would have been different. The jury already knew the salient points: M.S. was on probation, he faced the prospect of revocation for an unrelated matter, he faced the prospect of revocation and charges for the murder of Edis, and these matters were dropped in exchange for his testimony against Petitioner. This degree of bias or impeachment would not have been heightened by also telling the jury that the original charges were stealing, burglary, and property damage or that the reason M.S.'s probation could have been revoked was because he was smoking marijuana. The additional information would not have created a reasonable probability of a different outcome, so no prejudice was caused by counsel's failure to pursue the matter.

8

## C. Prosecutorial Misconduct

The Amended Petition sets forth four claims of prosecutorial misconduct:

1. During redirect, the prosecutor asked M.S. whether his "deal" was to implicate his father or to tell the truth. Over defense counsel's objection, M.S. was permitted to testify that he was required to tell the truth. Tr. at 898-99.

2. At the beginning of closing argument, the prosecutor made the following statements:

> Now, having grown up in a small town myself and gone to law school and deciding I wanted to be a prosecutor for the rest of my life, I didn't know anything about criminals. I didn't know how they thought because I had never been around any criminals before. In a small town you rarely see things like you have heard today. But over this 25 years –
>
> MS. SHAW: I'm going to object to this area as personalization.
>
> THE COURT: Be overruled. You may continue.
>
> MR. FINNICAL: – over these 25 years I've developed some instincts which I hope I can pass to you which will assist you in resolving the issues that you have before you.
>
> \* \* \*
>
> So, what I'm going to try to do is try to give you some pointers as to what certain pieces of evidence mean when you're dealing with people who are under the pressure of a murder investigation in an effort allow you to evaluate the evidence and maybe I might be able to help.
>
> \* \* \*

Tr. at 1069-70.

> I'm going to show you– I'm going to show you a couple things that I observed in here in Court with you, that show that there's an [indicia] of reliability of [M.S.]'s statement about what happened in the garage.
> When people are under investigation for murder they are afraid, and when they are afraid, even though they aren't paranoid in the paranoia sense, they are worried and afraid. And every person who murders somebody, their radar immediately goes out.

9

Tr. at 1071.

> There is an issue of reliability that normally I would never have known had I not dealt in these matters before. Look, I didn't grow up on the street –
>
> MS. SHAW: You're Honor, I'm still going to object to this area as personalization.
>
> THE COURT: Be overruled.
>
> MR. FINNICAL: – but I know the street after 25 years. Now, in dealing with people like Larry, and let me tell you the way it works.
> When something – When somebody has something on somebody, the relationship between those two people changes immediately. When somebody has something on somebody, the relationship as it existed before that event is completely altered. Think about this.
>
> \* \* \*
>
> [M.S] is saying I turned on the T.V. I didn't want to hear [the conversation between Petitioner and his girlfriend]. [M.S.], had he killed his grandmother, he would have wanted to hear everything. He would have wanted to know whether his father was betraying him, whether he was telling Barbara about this, but he didn't want to hear it. This kid didn't kill his grandmother.
> When I heard that statement, the reasonable reduction [sic] from [the] evidence, people who know the streets know that I didn't kill his grandmother.

Tr. at 1073-74.

3. The prosecutor purportedly indicated Petitioner's girlfriend (Barbara Malone) knew at 3:30 p.m. that Edis was dead and that Malone was afraid of Petitioner.

4. The prosecutor misled the jury into thinking M.S. had no prior criminal record when he elicited testimony that M.S. underwent a background check before entering the Navy. Tr. at 814.

### *1. Procedural Matters*

Before addressing the merits of these claims, certain procedural observations must be made. The last two issues were not raised in the state courts, and thus they have been procedurally defaulted. Moreover, Petitioner has not identified the portions of the transcript related to the third issue. The Court is neither required nor inclined to divine the portions of the transcript supporting Petitioner's claim.

There are also procedural problems with the first two issues. At trial counsel objected that the questions asked of M.S. on redirect constituted improper bolstering; on appeal, the argument raised was that the questions constituted improper vouching. The State argued the issue should be reviewed for plain error, but the Missouri Court of Appeals disagreed because "[w]hile . . . 'bolstering' and 'vouching' are technically distinct, we think the concepts are sufficiently close in this context that the trial court may have understood the nature of Streu's concern and we will not quibble about the differences here." State v. Streu, No. WD 58571, slip op. at 9 (Mo. Ct. App. Sept. 25, 2001). This reasoning takes on greater importance in light of the second issue. As stated, at trial defense counsel objected to the prosecutor's intimations that he had special knowledge unavailable to the jury on the grounds of "personalization." On appeal, the State argued, and the Missouri Court of Appeals agreed, that while some of the prosecutor's statements were objectionable it was because they constituted "vouching" and not because they constituted "personalization." However, in contrast to its approach to the "bolstering/vouching" issue on the first issue, the Missouri Court of Appeals reviewed only for plain error. This Court is not convinced that defense counsel's failure to lodge the technically correct objection to the closing argument constitutes an adequate and independent ground justifying a procedural default: the substance of the objection was just as clear to the trial court (even if the improper title was used)[4] as it was with respect to the redirect of M.S., yet for some reason the

---

[4]Interestingly, in denying Petitioner's 29.15 motion, the state trial court (the same judge who presided over the trial) stated "trial counsel did make an objection at trial. In reviewing the record, this Court finds that Movant's trial counsel made an appropriate objection." 29.15 Legal File at 47.

Missouri Court of Appeals' reasoning extended to one issue and not the other. The Court is unwilling to elevate form over substance.

### 2. The Merits

Petitioner does not explain the alleged impropriety in asking M.S. about the nature of the agreement to testify, and the Court discerns none. On cross-examination M.S. was asked a series of questions designed to suggest that he was testifying against his father in exchange for concessions in his own criminal matters. The prosecutor was entitled to establish that M.S.'s agreement was to tell the truth, not to provide damning evidence against his father without regard to the truth. Cf. United States v. Tulk, 171 F.3d 596, 600 (8th Cir. 1999).

With respect to the second issue, the controlling case with respect to prosecutorial misconduct in closing argument is Darden v. Wainwright, 477 U.S. 168 (1986). "[U]nder Darden, habeas relief is only appropriate if a prosecutor's improper closing argument so infected the trial with unfairness as to make the resulting conviction a denial of due process." Cole v. Roper, 623 F.3d 1183, 1194 (8th Cir. 2010) (quotations from Darden omitted). "Under this standard, a petitioner must show that there is a reasonable probability that the error complained of affected the outcome of the trial--i.e., that absent the alleged impropriety, the verdict probably would have been different." Newlon v. Armontrout, 885 F.2d 1328, 1336-37 (8th Cir. 1989), cert. denied, 497 U.S. 1038 (1990) (quotations omitted); see also Darden, 477 U.S. at 181; Stringer v. Hedgepeth, 280 F.3d 826, 829 (8th Cir. 2002). In evaluating the potential for prejudice, the Court must consider "(1) the type of prejudice that arose from the remark; (2) whether defense counsel did anything in his argument to minimize the prejudice; (3) whether the jury was properly instructed; and (4) whether there is a reasonable probability that the outcome of the [proceeding] would have been different . . . ." Young v. Bowersox, 161 F.3d 1159, 1162 (8th Cir. 1998); see also Hall v. Luebbers, 341 F.3d 706, 716 (8th Cir. 2003).

Several of the statements are improper for suggesting the prosecutor has access to information or expertise unavailable to the jurors. However, improper statements are not automatically prejudicial. The substance of the argument actually invoked the jurors' sense of reasonableness in evaluating Petitioner's, M.S.'s, and others' actions – which the prosecutor was free to do. For instance, in arguing that M.S. did not kill his grandmother, the prosecutor suggested that a person who committed murder would have stayed near the conversation between Petitioner and Malone to see what was said. This is a fair inference from the evidence and an invocation of jurors' common sense. Considering the context of the statements and the closing argument in its entirety, the Court concludes the outcome of the trial would not likely have been different. The prosecutor was also entitled to invoke the juror's common sense in order to draw inferences from Petitioner's statements.[5]

As stated earlier, the third and fourth allegations of prosecutorial misconduct were procedurally defaulted. While the merits of the third ground cannot be analyzed (because Petitioner has not identified the portions of the transcript in question), the Court notes the fourth ground is non-meritorious in any event. M.S. was asked if he passed a background check; he was not asked if lacked a criminal record. In confirming that he passed a background check, all M.S. established was that he passed it to the Navy's satisfaction. There was no danger the jury was mislead into believing M.S. never had any legal difficulties; as discussed in Part II.B.2, the jury knew about M.S.'s juvenile record.

---

[5]Some of these statements included his fear – expressed before it was determined Edis had been murdered – that the police would try to "pin" Edis' death on him and his comments about rigor mortis and the positioning of dead bodies he witnessed in Vietnam, even though he was never in Vietnam.

### D. Ineffective Assistance of Counsel: Failure to Make the Proper Objection to the Closing Argument

Petitioner contends his attorney provided ineffective assistance in failing to make the proper objection to the prosecutor's closing argument. While the Missouri Court of Appeals reviewed for plain error, he contends the "normal" standard of review accorded to properly preserved issues would have resulted in a reversal. It appears this claim was procedurally defaulted in that it was not presented in the appeal from the denial of the 29.15 motion. In any event, this Court conducted an essentially de novo review of the claim and concluded no relief is warranted for the improper statements made in closing. Accordingly, there could be no prejudice under Strickland.

### E. Ineffective Assistance of Counsel: Other Instances of Failing to Make Proper Objections

Within this argument Petitioner presents three instances in which trial counsel failed to make a proper objection.
1. Characterizing the prosecutor's questions to M.S. on redirect as bolstering instead of vouching.
2. Failing to object in closing argument when the prosecutor stated, referring to M.S.:

> This young man was never charged with murder. He was given a Petition in juvenile court where they have to tell them what the potential charge is and what the penalty range is for the offense for which he is being investigated.

Tr. at 1070-71.
3. Failing to obtain a ruling with respect to the State's motion in limine regarding M.S.'s juvenile record.

The first two issues were not raised in the state courts, so they have been procedurally defaulted. Petitioner suggests the default can be excused due to the ineffectiveness of post-conviction counsel, but the Court has already addressed this argument. However, even if the merits were considered, Petitioner would not be

14

entitled to relief. Petitioner was not prejudiced by trial counsel's failure to object to the questioning as "vouching" because, as stated in Part II.C.1, the Missouri Court of Appeals considered the merits of the objection. With respect to the latter two issues, the prosecutor's explanation of the mechanics of the juvenile justice system were technically correct, so no objection would have been meritorious. Regardless, the jury was aware of M.S.'s juvenile difficulties, and the issues surrounding the particulars of M.S.'s juvenile record were discussed and rejected in Part II.B.

### F. Admission of Hearsay Evidence in Violation of Confrontation Clause

Petitioner objected to Thompson's testimony that she told Petitioner Charlie Hamlett (Edis' neighbor) saw Petitioner's truck in Edis' driveway earlier that day.[6] The issue was raised on appeal, but the Missouri Court of Appeals held the testimony was admissible because it was offered not to prove that Petitioner's truck was in the driveway, but rather to show that Petitioner altered his account of his actions that day after hearing the statement. The Missouri Court of Appeals also noted that there was other evidence establishing Petitioner had been at Edis' house earlier in the day, including Petitioner's own statements. Tr. at 1028 (testimony of Rita Delcour); Tr. at 778-789 (transcript of Petitioner's statements to police read to the jury).

Petitioner contends the Missouri Court of Appeals "concocted" the justification that the statement was not offered to prove the truth of the matter asserted. This is an incorrect and unfair characterization. This explanation was offered to the trial court. Tr. at 23-24, 510-14, 794-95. The issue was mentioned briefly in closing, and the argument was consistent with this explanation. Tr. at 1080. For some reason, on appeal the State backed away from this theory, seemingly conceding that the statement was hearsay but its admission was not prejudicial. Respondent's Exhibit D at 41. However, it is wrong to intimate that the Missouri Court of Appeals created this explanation on its own.

---

[6]Hamlett did not testify at trial because he had passed away before trial.

The Missouri Court of Appeals' determination that the evidence was not offered for the truth of the matter is not only reasonable, it is also correct. While Petitioner was entitled to a limiting instruction, he did not request one. In any event, other evidence establishes that he was at his mother's house, most notably in the form of Petitioner's own statements to the police. Assuming evidence about Hamlett's statement should not have been admitted, Petitioner does not explain how he was prejudiced. Petitioner's sixth ground is rejected.

### G. Ineffective Assistance of Appellate Counsel: Failing to Appeal Sufficiency of the Evidence

Petitioner was convicted of first degree murder.[7] In his 29.15 motion, Petitioner alleged his appellate counsel was ineffective for failing to appeal the sufficiency of the evidence to support the element of deliberation. The claim was denied, and Petitioner did not appeal. This constituted a procedural default that precludes consideration of the claim, and the failures on the part of post-conviction appellate counsel cannot excuse this default. Part II.B.1.

In any event, the claim fails on the merits. Performance of appellate counsel is governed by Strickland, but "[u]nless there is evidence to the contrary, we assume that counsel's decision not to raise a claim was a strategic decision to emphasize stronger claims at the expense of weak ones." Armstrong v. Gammon, 195 F.3d 441, 444 (8th Cir. 1999). Petitioner does not suggest any reason not to apply this presumption, and there are good reasons to believe this claim was not particularly strong. "The requirement of proof of deliberation 'sets first degree murder apart from all other forms of homicide.'" State v. Strong, 142 S.W.3d 702, 717 (Mo. 2004) (en banc) (quoting State v. O'Brien, 857 S.W.2d 212, 217-19 (Mo. 1993) (en banc)). "Deliberation" is statutorily defined as "cool reflection for any length of time no matter how brief." Mo. Rev. Stat. § 565.002(3). "Proof of deliberation does not require proof that the defendant

---

[7]The jury was also instructed on second degree murder and involuntary manslaughter.

16

contemplated his actions over a long period of time, only that the killer had ample opportunity to terminate the attack once it began." State v. Johnston, 957 S.W.2d 734, 747 (Mo. 1997) (en banc). Dr. Thomas Young, the Medical Examiner, testified that the medical evidence demonstrated the strangulation occurred over the course of minutes. Tr. at 580-84. The killer had the opportunity to stop strangling Edis before she died, and this period of time – while brief – was a sufficient opportunity for deliberation. Cf. State v. Glass, 136 S.W.3d 496, 514 (Mo. 2004) (en banc) (victim killed by asphyxiation; sufficient evidence of deliberation where "medical testimony in this case was that it took from two to three minutes for Steffini to die in this way."); State v. Simmons, 955 S.W.2d 729, 739 (Mo. 1997) (en banc) (deliberation established when evidence supported reasonable inference "that, after hitting Johnson in the head with a heavy object, Simmons saw that she was not dead, took off his necktie, and spent four to five minutes strangling her."); State v. Smith, 944 S.W.2d 901, 916 (Mo. 1997) (en banc) (forensic pathologist testified "that a death caused by aphyxia is not instant . . . ."). This discussion establishes that the failure to appeal this issue did not prejudice Petitioner because even if the issue had been raised there is no probability that the outcome would have changed.

### H. Ineffective Assistance of Counsel: Advising Petitioner Not to Testify

Petitioner's final argument is that his trial counsel was ineffective for advising him not to testify. This issue was not raised in the 29.15 proceeding. This issue was raised for the first time as part of Petitioner's effort to reopen his 29.15 proceeding, but this was not the proper way to present this claim of ineffective assistance so the claim was procedurally defaulted. As before, the Court is constrained to reject Petitioner's claim that ineffective assistance of postconviction counsel provides cause and prejudice sufficient to excuse the default.

The Court notes two additional problems with this claim. First, Petitioner has never indicated what his testimony would have been. Even now, the Court does not know what Petitioner would have said if he had testified. A claim that a witness – even

the defendant – should have been called to testify cannot constitute ineffectiveness under Strickland if there is no indication as to what that testimony would have been. While a record has not been created (because the issue has never been raised in a proper proceeding), it is still incumbent upon Petitioner to allege grounds justifying relief. Second, and perhaps more importantly, the trial court discussed the matter with Petitioner and confirmed (1) Petitioner's understanding that he had the right to testify if he wished to do so and (2) Petitioner's attorney had explained the advantages and disadvantages of testifying and had discussed the matter fully.  Tr. at 1056-58.

### III.  CONCLUSION

Some of Petitioner's claims were procedurally defaulted, and all of his claims lack merit.  Accordingly, his Petition for Writ of Habeas Corpus is denied.

IT IS SO ORDERED.

DATE: July 11, 2011

/s/ Ortrie D. Smith
ORTRIE D. SMITH, SENIOR JUDGE
UNITED STATES DISTRICT COURT